United States District Court
For the Northern District of California

1
2
3
4                   UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   TERRANCE L. VARNER,                    Case No.  14-cv-02218-EMC

8              Petitioner,

9       v.                                 ORDER DENYING PETITION FOR
                                           WRIT OF HABEAS CORPUS
10  DAVE DAVEY,

11             Respondent.

12

13  JAJUAN PHILIP STROMAN,                 Case No.  14-cv-2245-EMC

14             Petitioner,

15      v.                                 ORDER DENYING PETITION FOR
                                           WRIT OF HABEAS CORPUS
16  DAVE DAVEY,

17             Respondent.

18

19              I.    **INTRODUCTION**

20         Terrence L. Varner and Jajuan Stroman were tried together and convicted of murdering

21  Clarence Ogden.  Their appeals were resolved in a single state court of appeal opinion.  Both filed

22  federal petitions for writ of habeas corpus under 28 U.S.C. § 2254.  Their cases were determined

23  to be related cases.  Respondent has filed an answer to each petition, and Mr. Varner and Mr.

24  Stroman have each filed a traverse.  For the reasons discussed in this order, the Court denies the

25  petitions for writ of habeas corpus from Messrs. Varner and Stroman.

26  ///

27  ///

28  ///

## II. **BACKGROUND**

A.    The Crime

The California Court of Appeal described the evidence presented at the trial:

> The killing occurred on the evening of March 28, 2004, and most people in the drama had street names. Defendants did not testify. There were variations in the eyewitness accounts, some evidently due to fear or loyalty, but the overall picture is that 18–year–old Ogden ("Little C") verbally accosted Stroman ("Wookie") at an Oakland street gathering by stepping into a tiff between Stroman and former girlfriend Seneca Casteele ("Slim"). Stroman left in his burgundy Oldsmobile, picked up Varner ("T"), who had a gun for each of them, returned with Varner in the car, and caught up with Ogden as he ran from a car in which he rode with Casteele and her friends. In front of dozens of people, defendants then got out, confronted Ogden and, as he fled from them, each shot him once in the back, killing him.

> **The scene**. The scene was East 22d Street as it rises from 23d Avenue to a crest and descends to 21st Avenue. It is an area of drug dealing, and alcohol and drug use. People commonly hang out at the crest, at a small housing authority complex and street-side parking lot. Several women, including Casteele and friends Asia Allen ("Angel") and Sumayyah Grey were out by Grey's car, parked in the lot. People from a barbeque at a house across from the lot were out in front, as were others. It was Sunday, and Ogden was on a weekend pass from a juvenile facility, Camp Sweeney, at the barbeque with friends. Ogden's longtime friend Lawrence Nero, still a minor, had been released from custody the week before and was out riding in Stroman's four-door Oldsmobile, drinking and using drugs with defendants. He was Varner's cousin and had known Stroman for six years.

> **Forensics.** An autopsy identified two penetrating gunshot wounds, neither fired close enough to leave powder burns. The order of infliction was not determined, but we identify them as shots one and two for ease of discussion.

> Shot one entered the left back, over six inches from the spine and 14 inches below the shoulder, passed a bit downward, and made a one-eighth-inch hole in the aorta before exiting near the armpit on that side. Shot two entered the right back over four inches from the spine and seven below the shoulder, hit no vital structures, just soft tissue and muscle, and had no exit wound. The bullet was removed during hospital treatment. Shot one made a round hole and a pathway three-eighths of an inch at its widest. Shot two made an ovoid entrance hole about one-half by three-eighths of an inch. The wounds did not allow typing of the weapon, weapons or caliber, but a larger hole can indicate a larger caliber. The same gun could leave both circular and ovoid holes.

2

United States District Court
For the Northern District of California

A third wound was a "grazing" one along the front of Ogden's left upper arm or shoulder. It did not penetrate the skin and could have been caused by the bullet from shot one as it exited near the armpit.

The cause of death was internal hemorrhage from multiple gunshot wounds. By far the more devastating wound was the one through the aorta, which could have caused death by itself. The second wound probably would not have caused death by itself, but passed through the body and "did contribute to the individual dying." The combination of the two wounds together is what caused Ogden's death.

The bullet recovered from Ogden's body was .25 caliber full metal jacket bullet, and a .25–caliber metal casing found at the shooting scene was, according to a police sergeant, from a semi-automatic weapon, not a revolver, and a ballistics expert could not say whether the recovered bullet and casing were related. No weapons were recovered.

**Investigation**. Homicide investigation by the Oakland Police Department (OPD) led to Casteele and Allen, who were interviewed early the next morning, and then Carl ("Ray–Ray") Anthony, all implicating Varner and Stroman. Months later, information from DeAngelo Hudson led to Nero, who was interviewed and initially arrested as an accessory.

Varner was apprehended in October 2004, after he was found living in Kentucky under an assumed name. Stroman was discovered in March 2005 in Sacramento, jailed under a false name.

***Testimony and Statements Highlighted on Appeal***
This case took years to get to trial, and three eyewitness accounts particularly bound up in the issues on these appeals were by people who, in the prosecutor's words, had opted to "go sideways." By this she meant that, having once given statements or testimony implicating defendants, witnesses changed their stories or claimed no memory when it came time to testify at a trial in front of defendants and others. We set out in some detail the highlighted accounts from Nero, Hudson, and Anthony.

**Lawrence Nero**. Lawrence Nero had been a friend of Ogden's for years, hung out with him all the time and, at age 17 on the night Ogden died, was near his age. In October 2004, seven months after the homicide, Nero was arrested by OPD officers as an accessory ( 32), gave a Mirandized statement [footnote omitted], and testified at defendants' preliminary hearing in July 2005, five months into a year-long youth authority commitment for drug possession. By the time of trial, he stood convicted but not yet sentenced for a San Francisco drug offense. He said he did not want to testify at all, but did cooperate in giving general facts leading to the homicide. He was Varner's cousin, knew Stroman, and spent the day hanging out with sometimes one and sometimes both of them, driving around in Stroman's burgundy Oldsmobile. They were "into heavy narcotics," and all three drank "Remy" and used marijuana and Ecstasy throughout the day.

3

Nero knew that Stroman had dated Slim (Casteele), and on a drive down East 22nd Street past her, with Nero in the car, Stroman got into an argument with her. Then when Ogden came up to the car and Stroman got out, those two got into a commotion that turned loud and threatening enough that Nero got out, got between the men, and pushed them apart. Ogden told Stroman, "'Get the fuck up out of here,' "and tried to get around Nero, telling Stroman to get out or else, as Casteele spewed aggressive words at Stroman. Stroman told Nero, "'Come on,'" and they both got back into the car (Nero in the front passenger seat) and drove away as Casteele stood on the curb. There had been a lot of onlookers, but Nero did not recall anyone else trying to halt the confrontation. They drove to 25th and parked near where Nero's grandmother lived. Varner was standing there and, asked by Stroman to get in, took the backseat. Stroman then told Varner what had happened and said something about Ogden "'talking shit.'"

At this point in his narrative, whereas he had previously said Varner left the car and returned with two guns, Nero started denying things or claiming lack of memory. But confronted with his prior statements, Nero conceded that Varner got the guns from behind some apartments, returned with them to the backseat, and passed a .25 automatic over to Stroman. Nero was not given one. Nero also conceded that the second gun, which Varner kept, was a chrome revolver, and said they went back to East 22nd Street. As to what happened next, however, Nero replied "I don't know" or "I don't recall" to virtually every question put to him. The prosecutor moved without objection to play Nero's October 2004 police statement to the jury, and jurors were provided transcripts.

In his police interview, Nero had related an argument between Stroman and Casteele on an earlier drive down East 22nd Street, and that Stroman went back after he phoned Casteele and she started "talking mess to him on the phone." It was on the return trip that Ogden got involved, and this was after Stroman got out of the car and started arguing with Casteele. After Nero broke up that confrontation, they "went and got T," who got the guns, and they went back a third time.

On the third trip, Nero had related, he remained in the front passenger seat and saw Ogden, Casteele and two other African American women pull away in a car. Stroman followed for two or three blocks, and back again, until the car pulled over near the top of the hill on East 22nd Street and Ogden got out, unarmed. Stroman stopped his car a bit behind, and Varner got out, gun in hand, grabbed Ogden and had him against a parked car. Stroman arrived on foot seven seconds later and shot Ogden once with the automatic, hitting him in the side. As Ogden ran off, Varner shot with the revolver some 10 feet away from Ogden, but Ogden kept running. Defendants ran back to the car, and Stroman kept going toward the car when someone walked up, confronted and started talking to him (out of Nero's hearing). Defendants jumped in, both saying the guy had a gun, and they all drove away together. Nero had stayed in the car but saw the shootings through the window from his place in the front passenger seat, about 30 feet away. He only heard the two guns that defendants fired, and he saw no weapons on Ogden. Nero

himself never had or shot a gun. As they drove off, Stroman phoned some female and was "cussing her out," calling her a stupid bitch. Defendants dropped Nero off at remote intersection, and he never saw what happened to the guns.

. . .

On further direct examination, he identified diagrams and pictures of a gray car as being the one he saw Ogden pinned against, but then he began backpedaling by saying that, when he spoke with police and district attorney personnel, he did so "to get you out of my face" and said he was not happy having to testify, particularly against his cousin in front of family. Then he told the prosecutor he did not recall whether Stroman got on the phone after the shooting and did not think he said on the tape that he saw defendants shoot Ogden.

On cross- and redirect examination, Nero stressed that he had been drinking and using drugs the day of the killing, and repeatedly said he went along with some things he was asked (or told) in his police interview in order to get out of the station or end the interview. In the end, several main points of retraction, despite contrary interview answers, were that: (1) he only heard shots being fired and never saw the shots being fired; (2) he lied when he said he saw either defendant fire a gun; (3) he could not see the action at the parked gray car, beyond knowing that defendants were with Ogden, because the gray car itself blocked his view; and yet (4) he could see that Ogden was just leaning back on the car, albeit with Varner's hand on his shoulder, and was not being grabbed or restrained.

*People v. Stroman, et al.,* Case Nos. A127950 and A127996, 2012 WL 2354112, at *1-4 (Cal. Ct. App. June 21, 2012).

The California Court of Appeal also described at great length the testimony of other eyewitnesses. The details of the witnesses' testimony generally are not relevant to the federal habeas claims, and therefore their testimony will only briefly be described here.

DeAngelo Hudson invoked his Fifth Amendment privilege against self-incrimination when called as a witness. The trial court admitted Mr. Hudson's preliminary hearing testimony. Mr. Hudson described the events leading up to Mr. Ogden's death, including Mr. Stroman driving back and forth several times with Mr. Varner in his car; Mr. Stroman and Ms. Casteele arguing and exchanging insults on several occasions that day; Mr. Stroman earlier telling Mr. Ogden to get away; and the final fateful encounter between Mr. Ogden and the defendants. Mr. Hudson saw Mr. Ogden "backed against a parked gray car, with both defendants 'up on him.'" *Id.* at 4. Mr. Hudson saw nothing in Mr. Ogden's hands, which were at his sides. Mr. Ogden appeared to be trying to get away from the car. When Mr. Ogden broke free and started to run away, "Stroman

yelled '"Get him,'" and Varner shot Ogden once in the back at arm's length. Then Stroman fired a second shot, hitting Ogden in the shoulder (where Hudson saw a blood spot on his white T-shirt). Hudson did not actually see guns but heard the shots, saw flashes from the end of each defendant's extended arms, and saw Ogden's body jerk from the impacts." *Stroman*, 2012 WL 2354112, at *4. Mr. Hudson saw Ogden run off in one direction, where Mr. Hudson later found him collapsed, and saw Messrs. Varner and Stroman walk away in the other direction.

Carl Anthony, a longtime friend of Mr. Ogden's, claimed to have memory problems at trial and the court admitted a taped statement he made to the police the morning after the shooting that "closely tracked Hudson's account." *Id.* at *5. Mr. Anthony saw Messrs. Stroman and Varner get out of a car and confront Mr. Ogden, putting a gun in his face and pushing him against a car. When Messrs. Varner and Stroman were momentarily distracted, Mr. Ogden tried to flee. "Stroman yelled '"Hit him!'" Anthony heard 'BAM!' as Varner fired first, dropping his cell phone and sweatshirt, and then Stroman fired, each hitting Ogden in the back. Ogden did not have a weapon." *Id.* at *5.

Seneca Casteele, Mr. Stroman's former girlfriend, gave trial testimony "so guarded and, to use the prosecutor's term, 'sideways,' that it was almost worthless beyond laying a foundation for admitting her preliminary hearing testimony." *Id.* at *6. Her preliminary hearing testimony described her and her friends driving around the area that day and her exchanges of insults with Mr. Stroman during their encounters that day. During one of their arguments, "as Stroman stormed back toward his car, he became engaged in an argument with Ogden, who followed him to the car to carry on at his driver's window (Casteele unable to hear what was said)." *Id.* at *6. She also testified at the preliminary hearing that, after she and her friends drove away with Mr. Ogden in the car, they realized that Mr. Stroman was following them. There was a car chase, during which there was some phone contact between Mr. Stroman and Ms. Casteele. The driver let Mr. Ogden (who was unarmed) out of the women's car. "As Ogden got out, Stroman pulled his car in front of them, and Varner 'bounced out' and went toward Ogden with a revolver." *Id.*

What followed in Casteele's version roughly tracked what other witnesses said except—inferably due to her loyalty and feelings toward the ex-boyfriend—that Stroman never left the car and Varner

6

1
2
3
4
5

> fired three to four shots at Ogden. Watching from a distance of about 10 to 15 feet out the back window of Grey's car, she saw Varner go up to Ogden, have words with him, and Ogden try to get past him. Within 15 to 20 seconds of Varner leaving the car, she saw him raise his hand with the revolver and fire once at Ogden, at 'body to body' range. That shot must have hit him in the shoulder, she figured, because Ogden 'spint around' and ran off. After some seconds, as if confused or hesitating, Varner fired two or three more times at Ogden's back. *Id.*

6   Asia Allen "testified at length, repeatedly claiming no memory of her preliminary hearing

7   testimony, but demonstrating an apparently good memory of many events." *Id.* at *6. "In the end,

8   while Allen corroborated much of other witnesses' accounts in many particulars, she said she did

9   not see either defendant with guns or at the shooting, and did not know if the shooter's car was

10  Stroman's. She did say, however, that the figure that left that car did not match the body shape of

11  Stroman, who was quite thin at the time." *Id.* at *8.

12  DeMaris Mata, who was on the sidewalk, saw a brown car with "lot of girls" drive by, then

13  about 20 feet to her right saw a man "get out on the passenger side and run, first up and then back

14  down the hill as a red or burgundy four-door car came and stopped ahead of the brown car. Mata

15  did not know any of the people in either car but saw four men in the burgundy car—including a

16  tall and slim one with a red hat, white shirt and jeans—get out and surround or encircle the man

17  from the other car. A tree partly blocked her view, but Mata could hear the one in the red baseball

18  hat say loudly, "'Why are you talking kind of shit about me?'" raise a black gun with 'a wheel' in

19  the middle to the other's temple, and punch him. Then as Mata turned and went up the neighbor's

20  stairs to hide, she heard one shot and then, two seconds later, another. From the window, she saw

21  the man without the hat run toward East 23rd Avenue. She did not see who did the shooting." *Id.*

22  B.   Procedural History

23  A jury trial was held in Alameda County Superior Court in 2009.  The jury found Messrs.

24  Varner and Stroman guilty of second degree murder (*see* Cal. Penal Code §§ 187, 189).  The jury

25  also found true the allegations that Messrs. Varner and Stroman each personally discharged a

26  firearm proximately causing the death (*see* Cal. Penal Code §12022.53(d)).

27  They each received a sentence of 40 years to life in prison on February 26, 2010.  The

28  sentences were comprised of 15 years to life for second degree murder, enhanced by 25 years to

1   life for personal discharge of a weapon causing death.  CT 838, 1560.

2       Messrs. Varner and Stroman filed a joint appeal.  On June 21, 2012, the California Court

3   of Appeal affirmed the convictions.  Messrs. Varner and Stroman each sought review in the

4   California Supreme Court, and review was denied on September 26, 2012.  They also filed

5   petitions for writ of habeas corpus in the California Supreme Court, which were summarily

6   denied.

7       Mr. Varner and Mr. Stroman then filed their federal petitions for writ of habeas corpus.

8   The Court determined that the cases were related.  *See* Docket No. 12 in *Varner*, No. C 14-2218

9   EMC.  There is a such a substantial overlap in their federal habeas claims that those claims are

10   best addressed in a single order, with the Court pointing out the few instances in which an

11   argument or analysis applies to only one of the petitioners.

12       Messrs. Varner and Stroman raise the following claims in their federal petitions for writ

13   of habeas corpus:  (1) their rights to due process and trial by jury were violated by the failure to

14   define "proximate cause" in the jury instruction for a sentence enhancement allegation; (2) (Mr.

15   Varner only argues) Mr. Varner's rights to due process and trial by jury were violated by the

16   aiding and abetting instructions that allowed him to be convicted on a legally improper theory; (3)

17   the admission of DeAngelo Hudson's preliminary hearing testimony violated their rights under the

18   Confrontation Clause; (4) the admission of Carl Anthony's statement to the police violated their

19   rights under the Confrontation Clause; (5) their due process rights were violated by the

20   prosecutor's misconduct during closing argument; (6) trial counsel for each of them provided

21   ineffective assistance in that counsel withdrew the request for a cautionary instruction on

22   accomplice testimony and Mr. Stroman's counsel failed to timely object to the prosecutor's

23   misstatement of the law on voluntary manslaughter in her closing argument; and (7) appellate

24   counsel for each of them provided ineffective assistance in failing to assert trial counsel's

25   ineffectiveness as an issue on appeal.  Respondent filed an answer to each petition.  Mr. Varner

26   filed a traverse and Mr. Stroman filed a traverse.

27       **III.**    **JURISDICTION AND VENUE**

28       This Court has subject matter jurisdiction over these actions for a writ of habeas corpus

under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  These actions are in the proper venue because the petitions concern the conviction and sentence of persons convicted in Alameda County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## IV.  STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'"  *Id.* at 409.

Section 2254(d) generally applies to unexplained as well as reasoned decisions.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be

1    presumed that the state court adjudicated the claim on the merits in the absence of any indication

2    or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

3    When the state court has denied a federal constitutional claim on the merits without explanation,

4    the federal habeas court "must determine what arguments or theories supported or . . . could have

5    supported, the state court's decision; and then it must ask whether it is possible fairminded jurists

6    could disagree that those arguments or theories are inconsistent with the holding in a prior

7    decision of [the U.S. Supreme] Court." *Id.* at 102.

8                                 **V.      DISCUSSION**

9    A.    Jury Instruction Error Claim:  Failure to Define Proximate Cause

10          Messrs. Varner and Stroman contend that the trial court's instruction on the sentence

11   enhancement allegation for personal discharge of a firearm failed to define proximate cause.  This

12   omission, they allege, violated their right to due process and right to trial by jury.

13          1.    Background

14          The indictments against Messrs. Varner and Stroman included sentence enhancement

15   allegations under California Penal Code section 12022.53(d).  Section 12022.53(d)) provides that,

16   any person who, in the commission of a murder (or other specified felonies) "personally and

17   intentionally discharges a firearm and proximately causes . . . death, to any person other than an

18   accomplice, shall be punished by an additional and consecutive term of imprisonment in the state

19   prison for 25 years to life."  Section 12022.53(d), "while requiring that a defendant intentionally

20   and personally discharge the firearm, does not require that he *personally inflict* great bodily injury

21   or death, only that he *proximately cause* it.  Thus '[a] person can proximately cause a gunshot

22   injury without personally firing the weapon that discharged the harm-inflicting bullet,' as where

23   two persons engage in a gun battle, killing an innocent bystander."  *Stroman*, 2012 WL 2354112,

24   at *10 (alteration in original; citation omitted) (quoting *People v. Bland*, 28 Cal. 4th 313, 337 (Cal.

25   2002)).

26          At trial, the jury was given the following instruction (modeled on CALJIC 17.19.5) for the

27   section 12022.53(d) sentence enhancement allegation:

28

United States District Court
For the Northern District of California

1
2

> It is alleged in Count 1 that the defendant intentionally and personally discharged a firearm and *proximately caused* great bodily injury or death to a person other than an accomplice during the commission of the crime charged.

3
4

> If you find the defendant guilty, you must determine whether the defendant intentionally and personally discharged a firearm and *proximately caused* great bodily injury or death to Clarence Ogden.

5

> . . .

6
7

> The term "intentionally and personally discharged a firearm," as used in this instruction, means that the defendant himself must have intentionally discharged it.

8

9  CT 816 (emphasis added).

10      The instruction given did *not* include a paragraph from the model instruction that defined

11  the term "proximately caused." The omitted paragraph would have stated: "A proximate cause of

12  death is an act or omission that sets in motion a chain of events that produces as a direct, natural

13  and probable consequence of the act or omission the death and without which the death would not

14  have occurred." *See* CALJIC 17.19.5.

15      The California Court of Appeal rejected the jury instruction error claim because the error

16  was harmless. *See Stroman*, 2012 WL 2354112, at *11. The appellate court explained that the

17  failure to include a definition of proximate cause was erroneous under state law, because the trial

18  court had a duty *sua sponte* to provide such a definition in the jury instructions. *See id.* (citing

19  *Bland*, 28 Cal. 4th at 334-36 (2002)). The California Court of Appeal explained that the error was

20  nonprejudicial:

21

22
23
24
25
26
27

> As *Bland* explained in finding lack of prejudice there "under any standard," lack of the instruction generally leads jurors to a more *limited* view of proximate cause than the law allows. "[J]urors who improperly *limit* their discussion of what constitutes proximate cause will not find causation where it does not exist. The correct definition of proximate causation is *broader*, not narrower, than jurors might assume. In a criminal case, we noted that 'in *Mitchell* [*v. Gonzales* (1991) 54 Cal.3d 1041] we criticized the [former proximate cause instruction] as placing undue emphasis on physical or temporal nearness. [Citation.] Thus, ... any such confusion on the jury's part could only benefit defendant.' [Citations.]" (*Bland, supra*, 28 Cal.4th at p. 338.) That appears to be the case here.

28

**United States District Court**
For the Northern District of California

1 | *Stroman*, 2012 WL 2354112, at *11 (alterations and omission in original).  In other words, the

2 | California Court of Appeal determined that Messrs. Varner and Stroman benefited from the

3 | instructional error because, had the full and proper instruction been given and proximate cause

4 | defined, the jury would have been more likely, rather than less likely, to find the sentence

5 | enhancement allegation true.

6 |       2.   <u>Analysis</u>

7 |       To obtain federal habeas relief for an error in the jury instructions, a petitioner must show

8 | that the error "so infected the entire trial that the resulting conviction violates due process."

9 | *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  "'A single instruction to a jury may not be judged in

10 | artificial isolation, but must be viewed in the context of the overall charge.'"  *Middleton v. McNeil*,

11 | 541 U.S. 433, 437 (2004) (quoting *Boyde v. California*, 494 U.S. 370, 378 (1990)).  "Even if there

12 | is some 'ambiguity, inconsistency, or deficiency' in the instruction, such an error does not

13 | necessarily constitute a due process violation."  *Waddington v. Sarausad*, 555 U.S. 179, 190

14 | (2009) (quoting *Middleton v. McNeil*, 541 U.S. at 436).  Where an ambiguous or potentially

15 | defective instruction is at issue, the court must inquire whether there is a "reasonable likelihood"

16 | that the jury has applied the challenged instruction in a way that violates the Constitution.  *Estelle*,

17 | 502 U.S at 72 & n.4; *Boyde*, 494 U.S. at 380.

18 |       If a constitutional error is found in the jury instructions, the federal habeas court also must

19 | determine whether that error was harmless by looking at the actual impact of the error.  *Calderon*

20 | *v. Coleman*, 525 U.S. 141, 146-47 (1998).  The habeas court must apply the harmless-error test set

21 | forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and determine whether the error had a

22 | "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Hedgpeth v.*

23 | *Pulido*, 555 U.S. at 58 (quoting *Brecht*, 507 U.S. at 623).

24 |       When, as here, the state court has found the error harmless, relief is not available for the

25 | error "unless *the harmlessness determination itself* was unreasonable."  *Davis v. Ayala*, 135 S. Ct.

26 | 2187, 2199 (2015) (emphasis in original).  In other words, a federal court may grant relief only if

27 | the state court's harmlessness determination "was so lacking in justification that there was an error

28 | well understood and comprehended in existing law beyond any possibility for fairminded

United States District Court

For the Northern District of California

1    agreement." *Id.* (quoting *Harrington v. Richter*, 562 U.S. at 103).

2        The California Court of Appeal's rejection of the federal constitutional claim was not

3    contrary to or an unreasonable application of clearly established federal law.  Assuming *arguendo*

4    the instruction's failure to define a term that should have been defined under state law amounted to

5    a federal constitutional violation, the state court's harmlessness determination was not

6    unreasonable.  The California Court of Appeal determined that providing the definition would

7    have made it more likely, rather than less likely, that the sentence enhancement would have been

8    found true.  This is because the undefined term, proximate cause, has a specific legal meaning

9    under California law that is broader than the meaning lay jurors would ascribe to the term, e.g.,

10    unlike a lay juror's assumption, a "proximate cause" does not mean proximity in time or location.

11    *See Stroman*, 2012 WL 2354112, at *11 (citing *Bland*, 28 Cal. 4th at 338, and *Mitchell*, 54 Cal. 3d

12    1041 (1991)).  The state court reasonably determined that the failure to define proximate cause

13    would not lead to the jury finding proximate cause where it did not exist.

14        The jury made the findings that Mr. Varner and Mr. Stroman "did personally and

15    intentionally discharge a firearm and caused death to Clarence Ogden."  CT 726, 1550.  It is

16    presumed that the juror followed the instructions they did receive.  *See Francis v. Franklin*, 471

17    U.S. 307, 324 n.9 (1985).  The instructions on the enhancement directed the jurors that, to find this

18    sentence enhancement allegation true, the jurors had to determine "whether the defendant

19    intentionally and personally discharged a firearm and proximately caused" death, and defined the

20    term "intentionally and personally discharged a firearm" to mean that "defendant himself must

21    have intentionally discharged it."  CT 816.  Under the circumstances of this case – two shots fired

22    into the victim's back at close range, and the combination of those two gunshot wounds causing

23    his death – the jury would not have reached a different verdict had the jury also been instructed

24    that, to be the proximate cause of the death, the defendant's act or omission had to "set[] in motion

25    a chain of events that produces as a direct, natural and probable consequence of the act or

26    omission the death and without which the death would not have occurred."  CALJIC 17.19.5

27    (Spring 2009).

28        It was not unreasonable for the California Court of Appeal to determine that the trial

United States District Court
For the Northern District of California

1   court's failure to give the legal definition of proximate cause – a definition which under California

2   law was broader than the meaning uninstructed jurors would ascribe to the term – was harmless

3   error in this case.  Moreover, in light of the facts at trial, even if the proximate cause instruction

4   had been given, the jury would not have reached a different verdict.  Messrs. Varner and Stroman

5   have failed to show that the California Court of Appeal's harmlessness determination was itself

6   unreasonable, *see Davis*, 135 S. Ct. at 2199, and therefore are not entitled to the writ on this claim.

7   B.      Jury Instruction Error Claim:  Aiding And Abetting/Implied Malice Instructions

8           Mr. Varner contends that the jury instructions allowed him to be convicted on a legally

9   improper theory of aiding and abetting an implied malice murder.  He contends that the jury

10  instructions allowed the jury to convict him of second degree murder under any of four different

11  theories, one of which was legally unsound.[1]  Specifically, the jury may have convicted him on the

12  legally improper theory that he "with some ill-defined mental state, 'aided and abetted' Mr.

13  Stroman, who killed Mr. Ogden with 'implied malice.'"  Docket No. 1 at 8 in Case No. C 14-2218

14  EMC.

15          1.      Background

16          Under California law, an aider and abettor "must 'act with knowledge of the criminal

17  purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or

18  facilitating commission of, the offense."  *Stroman*, 2012 WL 2354112, at *8.  An aider and abettor

19  can be liable either because (1) "an aider and abettor with the necessary mental state is guilty of

20  the intended crime," or (2) "under the natural and probable consequences [(NPC)] doctrine, an

21  aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a

22  'natural and probable consequence' of the crime aided and abetted.'"  *Id.* (alteration in original;

23  citations omitted).

24  _____

25  [1] Mr. Varner sets out the four theories under which he could have been convicted of second degree
    murder:  "(1) Mr. Varner personally shot Mr. Ogden with express malice, legally causing death;

26  (2) Mr. Varner personally shot Mr. Ogden with implied malice, legally causing death; (3) Mr.
    Varner, with the specific intent that Mr. Ogden be killed, aided and abetted Mr. Stroman, who

27  killed Mr. Ogden with express malice; and (4) Mr. Varner, with some ill-defined mental state,
    aided and abetted Mr. Stroman who killed Mr. Ogden with implied malice.'"  Docket No. 25-3 at
    30 and Docket No. 1 at 8 in Case No. C 14-2218 EMC.  Mr. Varner concedes that the first three of

28  these theories were "legally sound," and argues that the fourth theory was not legally sound.  *Id.*

United States District Court

For the Northern District of California

In this case, the instructional error problem allegedly flowed from the fact that the jury was instructed on aiding and abetting liability without also being instructed on the natural and probable consequences doctrine.  This, according to Mr. Varner, prejudiced him in two ways.  First, he argued that instructing that "'[e]ach principal, regardless of the extent or manner of participation is *equally guilty*' (CALJIC No. 3.00 (Spring 2009), italics added) incorrectly kept [the jurors] from finding him guilty of manslaughter rather than Stroman's crime of second degree murder." *Stroman*, 2012 WL 2354112, at *9.  Second, Mr. Varner argued that the "jurors were improperly allowed to find him guilty of second degree murder by sharing Stroman's implied malice—i.e., subjective awareness of the dangerousness of Stroman's acts."  *Id.*

The California Court of Appeal assumed *arguendo* that there were instructional errors and that the errors "implicated federal constitutional rights meriting review under the harmless-beyond -a-reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24," and determined that there was no prejudice from either error urged by Mr. Varner.  *Stroman*, 2012 WL 2354112, at *9.  The appellate court "conclude[d] beyond a reasonable doubt that the errors did not contribute to the verdict."  *Id.*

> Varner's theory of prejudice is that testimonial variation about how many shots were fired and whether he himself fired at Ogden allowed the jury to decide that he did not directly perpetrate the murder but, rather, aided and abetted by getting the guns and giving one to Stroman, and that the jury improperly found him guilty without assessing his own intent as an aider and abettor.
>
> The problem with his hypothesis is that the jury, beyond finding him guilty of second degree murder, also found true enhancements that, during the crime, he personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and did so proximately causing Ogden's death (§ 12022.53(d)).  On the evidence, the jury cannot have relied on aiding and abetting to return those enhancement findings, and thus no error in the aiding and abetting instructions could have affected the verdict.

*Stroman*, 2012 WL 2354112, at *9 (footnote omitted).

The appellate court further explained that, although section 12022.53(d) could be satisfied by a defendant intentionally and personally discharging a firearm without having "personally inflicted" death because the statute only required that he "proximately caused" the death, there

15

**United States District Court**
For the Northern District of California

was no reason to think that the jury relied on this sort of reasoning because the jury was not instructed on the special legal meaning of the term "proximate cause," which has a "meaning peculiar to the law" in California that is broader than jurors would expect. *See Stroman*, 2012 WL 2354112, at *10 (citing *People v. Bland*, 28 Cal. 4th 313, 335 (2002)). (The proximate cause definition issue is discussed in Section A, above.) Here, the "jury was never instructed on the meaning of proximate cause and thus had no reason to think Varner could have 'proximately caused' Ogden's death by merely setting in motion events that produced Ogden's death as a direct, natural and probable consequence." *Stroman*, 2012 WL 2354112, at *10. "There is no reason to think, on the evidence and presentation in this case, that the jury understood that section 12022.53(d) could require anything less than personal infliction of the harm." *Stroman*, 2012 WL 2354112, at *10.

     *2.*    Analysis of Federal Habeas Claim

     As mentioned in Section A.2, above, where an ambiguous or potentially defective instruction is at issue, the habeas court inquires whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle v. McGuire*, 502 U.S. at 72 & n.4. A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt, and may have relied on an invalid theory. *See Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam). A claim that the jury has been instructed on multiple theories, one of which is invalid, is subject to the harmless error test. *See id.* at 58-60 (Ninth Circuit erred in categorizing this sort of error as structural error). That is, the habeas court must determine whether the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Hedgpeth v. Pulido*, 555 U.S. at 58 (quoting *Brecht*, 507 U.S. 619, 623 (1993)).

     The Ninth Circuit discussed the harmless error analysis in a case in which a jury returned a general verdict after having been instructed on several theories, one of which is invalid, in *Babb v. Lozowsky*, 719 F.3d 1019 (9th Cir. 2013), *overruling on other grounds recognized by Kieren v.*

16

*Nevada Att'y Gen.*, 584 F. App'x 305 (9th Cir. 2014).[2]  The *Babb* decision explained that *Hedgpeth v. Pulido* rejected the Ninth Circuit's earlier approach, which had required that a reviewing court be able to say with "absolute certainty" that the instructional error had not influenced the jury's verdict.  *Babb,* 719 F.3d at 1034 n.9.[3]  The *Babb* court noted that although it rejected the Ninth Circuit's former approach, *Hedgpeth v. Pulido* provided no guidance as to how to determine harmlessness in the particular context of a general verdict upon multiple theories; generally, however, a court deciding whether an instructional error was harmless would "ask whether it is reasonably probable that the jury would still have convicted the petitioner on the proper instructions."  *Babb,* 719 F.3d at 1034 (citing *Belmontes v. Brown*, 414 F.3d 1094, 1139 (9th Cir. 2005), *rev'd on other grounds sub nom., Ayers v. Belmontes,* 549 U.S. 7 (2006)).  The court in *Babb* found it unnecessary to inquire into the probability that the jury, if given a proper instruction, would have convicted the defendant on the legally proper theory because the court could "discern with reasonable probability that the jury instead convicted Babb on a valid" theory. *Id.*  There, the jury received a legally deficient premeditated murder instruction and a legally sound felony murder instruction, after which the jury returned a general verdict of first degree murder.  In order to convict that defendant on felony murder, the jury had to find that she was guilty of robbery and that the victim was killed during the robbery; the jury did find her guilty of robbery and the "facts in this case leave no doubt" that the victim was killed in the robbery.  *Id.*  Further, the prosecutor "focused almost exclusively on the felony murder theory" for this defendant in closing argument. *Id.*  "In light of this overwhelming evidence supporting the felony murder theory, we can be reasonably certain that no juror convicted Babb based on premeditation

---

[2] A general verdict permits "a jury to convict based on different possible theories--without specifying the theory that forms the basis of the verdict."  *Babb,* 719 F.3d at 1033.

[3] That former approach was as follows:  "[A] general verdict that may rest either on a legally valid or legally invalid ground . . .may not stand when there is no way to determine its basis. . . . There is a limited exception to the principle: reversal may not be required if it is *absolutely certain* that the jury relied upon the legally correct theory to convict the defendant."  *Lara v. Ryan,* 455 F.3d 1080, 1085 (9th Cir. 2006) (internal quotation marks and citations omitted), *overruled in Hedgpeth v. Pulido,* 555 U.S. 57 (2008).  *Hedgpeth v. Pulido* observed that "an 'absolute certainty' standard is plainly inconsistent with *Brecht.*"  555 U.S. at 62.

17

**United States District Court**
For the Northern District of California

1   because the jury was specifically instructed to only consider premeditated murder if felony murder

2   did not apply." *Babb*, 719 F.3d at 1034.  The court emphasized that the issue is not simply

3   whether the court could be reasonably certain that the jury *could* convict based on the valid theory

4   of felony murder; instead, the reviewing court needs to be reasonably certain that the jury *did*

5   convict based on the valid theory.  *Id.* at 1035.[4]

6          Turning to the present case, the California Court of Appeal reasonably could have

7   concluded that it was reasonably certain that the jury convicted Mr. Varner on one of the valid

8   theories of second degree murder, rather than on the invalid theory that Mr. Varner, with some ill-

9   defined mental state, aided and abetted Mr. Stroman, who killed Mr. Ogden with implied malice.

10  Most importantly, as the California Court of Appeal recognized, the special findings on the section

11  12022.53(d) enhancement led to the conclusion that the jury did not convict Mr. Varner using the

12  invalid aiding and abetting theory.  Although there was a general verdict (i.e., the verdict found

13  Mr. Varner guilty of second degree murder without specifying the theory under which that finding

14  was made, CT 726), there also were special findings on the sentence enhancement allegations that

15  made the jury's decision-making process less inscrutable than it would have been had there been

16  only a guilty verdict on the murder charge.  The California Court of Appeal reasonably relied on

17  the fact that the jury had found that Mr. Varner had "intentionally and personally discharged a

18  firearm and caused death" to Mr. Ogden to determine that the jury did not rely on a theory that he

19

20  _____

    [4] Not all circuits use the same standard as *Babb*.  *See United States v. McKye*, 734 F.3d 1104,

21  1111-13 (10th Cir. 2013) (Briscoe, C.J., concurring) (questioning whether Tenth Circuit's
    approach complied with *Hedgpeth v. Pulido* and collecting cases showing different tests applied

22  by different circuits).  The *McKye* concurrence identified these varying tests used when a general
    verdict is issued after a jury is instructed on multiple theories, one of which is invalid:  (1) in the

23  Tenth Circuit, the verdict cannot be sustained "'unless it is possible to determine the verdict rested
    on the valid ground' or that 'the jury necessarily made the findings required to support a

24  conviction on the valid ground,'" *id.* at 1111;  (2) in the Fifth Circuit, the question is "'whether the
    record contains evidence that could rationally lead to an acquittal with respect to the valid theory

25  of guilt,'" *id.* at 1113 (citation omitted); (3) in the Third Circuit, "'[w]here there is a clear
    alternative theory of guilt, supported by overwhelming evidence, a defendant likely cannot show

26  that an instruction permitting the jury to convict on an improper basis was not harmless error,'" *id.*
    (citation omitted);  and (4) in the Fourth Circuit, if "'the evidence that the jury necessarily credited

27  in order to convict the defendant under the instructions given is such that the jury must have
    convicted the defendant on the legally adequate ground in addition to or instead of the legally

28  inadequate ground, the conviction may be affirmed,'" *id.*

had aided and abetted an implied malice murder to find Mr. Varner guilty of murder.  The section 12022.53(d) finding undermined Mr. Varner's contention that the jury may have thought his involvement was limited to aiding and abetting by supplying the guns.  "There is no reason to think, on the evidence and presentation in this case, that the jury understood" that the finding that Mr. Varner "intentionally and personally discharged a firearm and caused death" could be made on anything less than personal infliction of the harm.  *See Stroman*, 2012 WL 2354112, at \*10.  As the state court of appeal noted, the prosecutor did not argue that Mr. Varner could be liable on the section 12022.53(d) enhancement on anything less than personally inflicting the death, and the jury never asked any question about the enhancement allegation.  *See Stroman*, 2012 WL 2354112, at \*10.

Further, the prosecutor's closing argument never suggested that Mr. Varner had aided and abetted an implied malice murder, and mentioned aiding and abetting only fleetingly.  The prosecutor argued emphatically and repeatedly that Mr. Varner was guilty of first degree murder.  The prosecutor argued that Mr. Varner was one of the shooters who shot Mr. Ogden.  RT 1335-36, 1343-44, 1347, 1512, 1525.  The prosecutor further emphasized that Mr. Varner was guilty of first degree rather than second degree murder.  RT 1347 (premeditation); 1392 ("find him guilty of first-degree, premeditated and deliberate murder, because that's what the evidence supports"); *see also* RT 1342-43 and 1391-92 (second degree versus first degree murder).  She also argued that Mr. Varner was liable on the sentence enhancement for personal discharge of the firearm causing death.  *See* RT 1348-49, 1549.  Only a very few sentences of the prosecutor's 113-page closing argument even mentioned aiding and abetting liability for Mr. Varner.  The first time the prosecutor mentioned aiding and abetting liability as a possibility for Mr. Varner was in her rebuttal. There, the prosecutor argued that Mr. Varner could be found guilty as an aider and abettor, although as quickly as she mentioned it she urged the jury that the evidence overwhelmingly showed his direct guilt:  "Terrance having the gun there, threatening to shoot, getting in the fight, holding him, getting the guns – all of that as an aider and abettor.  But you don't have to even get there, because they did it by themselves individually, and there is overwhelming evidence of that. . . . Both of them, they both shot him."  RT 1545.  The second and

**United States District Court**
For the Northern District of California

1   last time the prosecutor mentioned aiding and abetting liability for Mr. Varner was in connection

2   with a question on the verdict form as to whether a principal was armed with a firearm, i.e., the

3   jury could find that allegation true based on Mr. Stroman's gun use "if for some reason you

4   believe that Mr. Varner's guilty as an aider and abettor. . . . You can find that true, but we know he

5   used the gun.  All of the witnesses, with the exception of the two girls, have said it's Mr. Varner."

6   RT 1549.  The prosecutor overwhelmingly emphasized that Mr. Varner fired one of the shots that

7   struck Mr. Ogden, and was guilty of first degree murder.  Finally, the prosecutor never argued that

8   Mr. Varner aided and abetted an implied malice murder; rather, she unblinkingly argued that Mr.

9   Stroman shot Mr. Ogden with premeditation, deliberation and an intent to kill him.  *See Babb*, 719

10  F.3d at 1034 (prosecutor's argument focusing almost exclusively on the permissible theory

11  supported a finding of harmlessness).  As in *Babb*, the prosecutor "focused almost exclusively on"

12  the legally valid bases of liability for Mr. Varner. *Babb*, 719 F.3d at 734.

13      The jury deliberations were relatively brief and the jurors sent no questions to the court

14  about aiding and abetting, implied malice, or Mr. Varner's responsibility.  "'Longer jury

15  deliberations weigh against a finding of harmless error because lengthy deliberations suggest a

16  difficult case.'"  *United States v. Lopez*, 500 F.3d 840, 846 (9th Cir. 2007) (quoting *United States

17  v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001)); *see, e.g., id.* at 846 (jury's deliberation

18  for 2-1/2 hours on illegal reentry case suggested any error in allowing testimony or commentary

19  on defendant's post-arrest silence was harmless); *Velarde-Gomez*, 269 F.3d at 1036 (jury

20  deliberation for 4 days supported inference that impermissible evidence affected deliberations).

21  After a 22-day trial, the jury took less than 11 hours to reach verdicts in this case.  *See* CT 1545-

22  52.  Given that there were two defendants, and special findings questions that had to be answered

23  for each of them, the California Court of Appeal reasonably could have determined that the 11-

24  hour deliberation period did not suggest a difficult case, and weighed in favor of a finding of

25  harmlessness.

26      The California Court of Appeal's harmless error determination was not itself unreasonable.

27  *See Davis v. Ayala*, 135 S. Ct. at 2199.  Mr. Varner therefore is not entitled to the writ on this

28  claim.

United States District Court
For the Northern District of California

C. Confrontation Clause Claim:  Mr. Hudson's Preliminary Examination Testimony

 Mr. Varner contends that his rights under the Confrontation Clause were violated by the admission of the preliminary examination testimony from DeAngelo Hudson.  That testimony was admitted after Mr. Hudson invoked his Fifth Amendment privilege against self-incrimination.

 1. Background

 Mr. Hudson testified at the July 2005 preliminary hearing in this action.  By the time of the Stroman/Varner trial in 2007, Mr. Hudson was in jail as a pretrial detainee on a separate murder charge.  When called as a witness at the Stroman/Varner trial, Mr. Hudson immediately invoked his privilege against self-incrimination.  Mr. Hudson's attorney informed the court that Mr. Hudson was invoking his privilege against self-incrimination because the pending murder charge as well as evidence of his involvement in a drug transaction could be used to impeach Mr. Hudson.  In an *in camera* session, Mr. Hudson and his attorney made a record of the full extent of the concerns so that the trial court could rule on the privilege.  After hearing those concerns, the trial court ruled that Mr. Hudson was an unavailable witness because his invocation of his privilege against self-incrimination was proper under state law and Mr. Hudson continued to refuse to answer any questions.  The defendants objected under *Crawford,* and the prosecutor offered to stipulate to the current murder charge, the earlier-pending drug charge, and Mr. Hudson's conviction for the drug offense.  The prosecutor also represented that there were no inducements sought by or offered to Mr. Hudson for his cooperation in this case.  The trial court admitted the preliminary hearing testimony, with the stipulations.  Mr. Hudson's preliminary hearing testimony was read to the jury, "including over 100 pages of cross-examination by counsel for Varner (also his trial counsel) and lesser follow-up examination by prior counsel for Stroman.  Stipulations at the close of the reading informed the jury that Hudson had been arrested in February and September of 2005 for sales or transportation of narcotics, that this resulted in his felony conviction, and that he had been arrested and was now charged for a 2007 murder." *Stroman*, 2012 WL 2354112, at *13.

 The California Court of Appeal rejected the claim that the admission of Mr. Hudson's preliminary hearing testimony violated the Confrontation Clause rights of Messrs. Varner and

Stroman.  That court concluded that the preliminary hearing testimony was admissible under *Crawford* because the witness was unavailable and the defendants had a prior opportunity to cross-examine the witness.  *Stroman*, 2012 WL 2354112, at *13-14.  The court explained that a witness who successfully asserted the privilege against self-incrimination was an unavailable witness.  *Id.* at 13.  The appellate court also rejected the defense argument that the quality and effectiveness of the prior cross-examination had to be examined to determine that the evidence was sufficiently reliable to be admissible without violating the Confrontation Clause.  The court explained that reliability was no longer part of the inquiry under the Confrontation Clause, as "*Crawford*  made a prior opportunity to cross-examine a witness "'"dispositive" of the admissibility of his testimonial statements.'"  *Stroman*, 2012 WL 2354112, at *14.

      2.    <u>Analysis</u>

The Confrontation Clause of the Sixth Amendment provides that in a criminal case the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.  The ultimate goal of the Confrontation Clause "is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner:  by testing in the crucible of cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).  The Confrontation Clause applies to all "testimonial" statements.  *See Crawford*, 541 U.S. at 50-51.  "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  *Id.* at 51 (internal quotation marks and brackets omitted).  Out-of-court testimonial statements are barred under the Confrontation Clause unless (1) the witness is unavailable, and (2) the defendant had a prior opportunity to cross-examine the witness.  *Crawford*, 541 U.S. at 59.

The California Court of Appeal's rejection of the Confrontation Clause claim was a straightforward and correct application of *Crawford*.  The preliminary hearing transcript was a testimonial statement, and therefore subject to the limits of the Confrontation Clause.  As *Crawford* explained, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing."  *Id.* at 68.  The only two requirements for the preliminary hearing testimony to be admissible without offending the Confrontation Clause were met.  First, Mr.

United States District Court

For the Northern District of California

Hudson was an unavailable witness due to his invocation of his Fifth Amendment right to avoid self-incrimination. *See California v. Green*, 399 U.S. 149, 167-68 (1970) (Confrontation Clause would not prohibit a State from relying on a witness' prior testimony when witness "claimed his privilege against compulsory self-incrimination"). Second, Messrs. Varner and Stroman had a prior opportunity to cross-examine Mr. Hudson at the preliminary hearing. *See Delgadillo v. Woodford*, 527 F.3d 919, 926 (9th Cir. 2008) (trial court properly admitted girlfriend's statements to detective because, even though she did not appear at trial, she had testified at the preliminary hearing at which time the defendant had an opportunity to cross-examine her). The admission of Mr. Hudson's preliminary hearing testimony after he invoked his privilege against self-incrimination and refused to testify did not result in a Confrontation Clause violation. The California Court of Appeal's rejection of the Confrontation Clause claim was not contrary to, or an unreasonable application of, clearly established law as set forth by the United States Supreme Court.

D.     Confrontation Clause Claim:  Mr. Anthony's Prior Statements

Messrs. Varner and Stroman next claim that the admission of Carl Anthony's prior statements to the police violated their Confrontation Clause rights.

1.     Analysis

The facts for this claim are that Mr. Anthony gave a detailed statement to the police the morning after the killing, but had memory problems at trial.

> When called before the jury at trial, however, he said straightaway that he did not want to be there and, while conceding that he knew Ogden and Stroman, and passingly knew Varner, denied memory of most events of that day beyond an image of his best friend, Ogden, lying dead on 23rd Avenue. In extensive direct and cross-examination, he claimed he did not, or did "[n]ot really" remember what went on, even when passages of his police statement were read to him. He said he prepared for his testimony by listening to the taped statement with a transcript, and recognized his voice on the tape, but he claimed no memory of the arguments, shooting, or confrontations of the fatal evening, who was there, what kind of car Stroman drove or owned, knowing which "Rome" might have been there, or seeing either defendant with a gun. He also denied memory of picking defendants out of photo spreads days later.

> Anthony blamed his past use of drugs, especially Ecstasy, for a memory so poor that he could not recall being shot two years before trial, but even the cold record leaves a strong impression that he was feigning memory loss to avoid having to testify. His nearly total loss of memory, with surrounding memories intact, defied logic, and he tripped himself up in at least one major inconsistency, claiming no memory of speaking with police officers or giving them a statement, yet recalling having a "drug warrant" out for him at the time, having a sense *in making the tape* that he would "get out" if he told officers what they wanted to hear, and having an understanding *from speaking with the officers* that they would let him go and not serve the warrant if he cooperated.

*Stroman,* 2012 WL 2354112, at *14 (footnote omitted).  The trial court allowed Mr. Anthony's statement to the police to be read into the record, after Mr. Anthony failed to recall almost any detail of his prior statements.

On appeal, Messrs. Varner and Stroman claimed that the admission of Mr. Anthony's statement violated their confrontation rights because they were unable to effectively cross-examine Mr. Anthony due to his memory problems.  The California Court of Appeal concluded that the admission of the statement was permissible under the California Evidence Code, and did not offend the Confrontation Clause.  The appellate court rejected the argument that the witness' apparently feigned memory loss deprived Messrs. Varner and Stroman of an adequate opportunity to cross-examine him.  The state appellate court relied on *United States v. Owens*, 484 U.S. 554 (1988), and state court cases for its determination that the professed lack of memory of the witness did not equate to the lack of opportunity to cross-examine the witness.  *Stroman*, 2012 WL 2354112, at *17.  Even if the statement was testimonial under *Crawford*, there was no constitutional error in admitting it because the witness was present in court and subject to cross-examination.  *Stroman*, 2012 WL 2354112, at *17.

    2.   <u>Analysis</u>

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him."  U.S. Const. amend. VI.  A primary interest secured by the Confrontation Clause is the right of cross-examination.  *See Davis v. Alaska*, 415 U.S. 308, 315-16 (1974).  However, "the Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"  *United States v. Owens*, 484 U.S. 554, 559

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   (1988) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987)).

2   As mentioned in Section C, above, the Confrontation Clause applies to all "testimonial"

3   statements.  *See Crawford*, 541 U.S. at 50-51.  Out-of-court testimonial statements by a witness

4   are barred under the Confrontation Clause unless the witness is unavailable and the defendant had

5   a prior opportunity to cross-examine the witness.  *Id.* at 59.  However, the Confrontation Clause

6   does not bar the admission of testimonial hearsay when the declarant appears for cross-

7   examination at trial.  *Id.* at 59 n.9 (citing *California v. Green*, 399 U.S. at 162).  For example, the

8   Confrontation Clause is not violated by the admission of a prior identification by a witness who is

9   unable, because of memory loss, to testify concerning the basis for the identification.  *Felix v.*

10  *Mayle*, 379 F.3d 612, 617-18 (9th Cir. 2004) (citing *Owens*, 484 U.S. at 564), *overruled on other*

11  *grounds by Mayle v. Felix*, 545 U.S. 644 (2005).  Even where the sincerity of a trial witness'

12  claimed memory loss appears "disingenuous," his prior statement may be admitted without

13  offending the Confrontation Clause.  *Beltran v. Runnels*, 409 F. App'x 997, 997-98 (9th Cir. 2011)

14  ("introduction of prior inconsistent statements by two witnesses, who at trial recanted and claimed

15  to have forgotten nearly everything about the murder," did not violate petitioner's Confrontation

16  Clause rights, even if their memory loss appeared disingenuous).

17  In *Owens*, the victim's memory was impaired after a criminal attack.  484 U.S. at 556.

18  While at the hospital, the victim described the attack and identified the defendant as his attacker.

19  *Id.*  At trial, the victim testified that he remembered identifying the defendant, but could not

20  remember actually seeing the attacker.  *Id.*  The Supreme Court held that there was no

21  Confrontation Clause violation because the Confrontation Clause only guarantees an *opportunity*

22  for effective cross-examination.  *Id.* at 559.

23  Here, as in *Owens*, "the traditional protections of the oath, cross-examination, and

24  opportunity for the jury to observe the witness' demeanor satisf[ied] the constitutional

25  requirements."  *Id.* at 560 (citing *Green*, 399 U.S. at 158-61).  Messrs. Varner and Stroman had

26  "the opportunity to bring out such matters as the witness' bias, his lack of care and attentiveness,

27  his poor eyesight, and even (what is often a prime objective of cross-examination ) the very fact

28  that he has a bad memory."  *Id.* at 559 (citation omitted).  That their cross-examination may not

have succeeded in impugning Mr. Anthony's statement does not matter because "successful cross-examination is not the constitutional guarantee." *Id.* at 560.  Moreover, in *Crawford*, the Supreme Court "reiterate[d] that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Crawford*, 541 U.S. at 60 n.9.  Assuming that Mr. Anthony's statement to the police was a testimonial statement, the admission of that statement at trial did not violate the Confrontation Clause because he testified and was subject to cross-examination at trial.  The California Court of Appeal's rejection of this claim was not contrary to, or an unreasonable application of, clearly established law, as set forth by the U.S. Supreme Court.

E.    Claim of Prosecutorial Misconduct During Closing Argument

    Messrs. Varner and Stroman next argue that the prosecutor engaged in misconduct during her closing argument, in violation of their due process rights.  According to Messrs. Varner and Stroman, the prosecutor misstated the law of voluntary manslaughter in an example she gave of heat-of-passion voluntary manslaughter.  They argue that the problem was exacerbated by their inability to counter the argument because the prosecutor made the offending comments during her rebuttal and the trial court refused to allow the defense to offer further argument in surrebuttal.

    1.    Background

    During her closing argument, the prosecutor did not focus on voluntary manslaughter.

    During his closing argument, Mr. Stroman's counsel, Mr. Strellis, argued about the degree of the homicide and that, if Mr. Stroman did the killing, the crime was voluntary manslaughter. *See* RT 1478, 1481, 1490.  Mr. Strellis' argument was misleading about the law of heat-of-passion voluntary manslaughter in that it suggested that the argument between Mr. Stroman and Ms. Casteele (i.e., Mr. Stroman's ex-girlfriend) could provide the provocation sufficient to make Mr. Stroman's shooting of Mr. Ogden a voluntary manslaughter based on heat-of-passion. *See* RT 1479-82, 1488-90.[5]  Mr. Strellis also pointed out that he made his argument without the benefit of

----

[5] For example, Mr. Strellis argued:  "Now, a heat of passion obviously is what a relatively reasonable person would do under like circumstances.  [¶]  Can you imagine anything more shattering to a young man or, for that matter, a young woman than to break up not a marriage, but a close-to-marriage, a hot affair, as it were, for nine months where they were together almost every

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    hearing the prosecutor's theory on the "significant issue" of voluntary manslaughter. RT 1484.

2    He noted that the prosecutor would have the last word, and that he would not be able to rebut

3    anything she said about his closing argument. *See* RT 1484, 1496.

4         During her rebuttal closing argument, the prosecutor stated that she had not talked about

5    manslaughter in her initial closing argument because manslaughter and the related instructions did

6    not apply to the facts of the case. RT 1504. She argued that "[t]he reason it doesn't apply in this

7    case is because you don't get to have a fight with your girlfriend and then use that as an excuse

8    later to kill somebody" else. RT 1504. She urged that there were certain circumstances and

9    situations where the killer would "be responsible, but society is going to say that we understand

10   why a reasonable person might have acted in the same manner that you did." RT 1505. The

11   prosecutor then gave this example.

> What is required in order [] for society to accept that a reasonable person would have acted that same way, it has to be pretty extreme, and that is not this case. [In w]hat kind of case might it apply? Well, the standard case where it does apply, or standard example, is where you have a person—for example, there is a dad, and he is at home. His seven-year-old daughter is upstairs playing in her room. The doors are locked. He is outside doing his gardening. [¶] He hears some noise. He goes inside the house and he still has the shears with him. He goes upstairs and he could hear his daughter crying. He takes the shears and he's [l]ike, 'What's wrong, Janie?' [¶] He goes inside and he sees his daughter completely naked. She's crying, and there is a man on top of her—a complete stranger raping a seven-year-old child. And he takes those shears, and he stabs that guy and he kills him. [¶] That is the extreme case where society will say you're still wrong for killing that person. You're still wrong for killing that person, but a reasonable person in those circumstances might have acted the same way. [¶] The key—there's two keys to whether or not heat of passion applies, and again I'm not spending a lot of time on it, because it doesn't apply to this case and it definitely absolutely does not apply to Terrance Varner."

day, according to the witnesses? That can't be anything but highly emotional. [¶] We read all the time about homicides that result from that kind of rejection. It's not unusual. Add to that weed, the smoking of marijuana, ecstasy and alcohol. And you have a mixture where you cannot say it seems to me with a straight face that there was not an operation of heat of passion. [¶] And I have got to add one more thing for it. The burden is hers to prove it was not." RT 1479-80. Later, Mr. Strellis argued: "Obviously, if he did it at all, he did it in the heat of passion. They are angry. They fight every time they see each other." RT 1481. Later still, he argued: "They just broke up two weeks ago according to the testimony as I heard it of the witnesses. [¶] So, we have heat of passion." RT 1482.

1   RT 1505-06.

2           Neither defendant objected to this argument when made.  After the prosecutor concluded

3   her argument – about 50 pages later – and after the jury was excused for lunch, Mr. Strellis asked

4   for permission to reopen his closing argument to rebut the prosecutor's comments about

5   manslaughter.  RT 1558.  Mr. Strellis asserted that the prosecutor's example was legally incorrect;

6   rather than being a voluntary manslaughter, the killing of someone raping a child would not have

7   been a crime at all because it was "stopping a felony dangerous to human life. And she put that out

8   as the average sort of thing," and did not argue it until rebuttal.  RT 1558.  The prosecutor argued

9   that it was a standard example and was not improper.  RT 1558.  The trial court denied the defense

10  request for surrebuttal.  RT 1559.  The trial court found the objection untimely, and noted that, if

11  the objection had been made at the time the prosecutor gave the example, the court could have

12  given an admonition or otherwise dealt with it at the time the comment was made if necessary.  "It

13  was argument.  It is not factual in terms of this case."  RT 1559.

14          The California Court of Appeal rejected Mr. Stroman's argument that there was

15  prosecutorial misconduct.  The court of appeal noted that Messrs. Varner and Stroman did not

16  argue on appeal that the prosecutor's example did not constitute manslaughter, and the court of

17  appeal saw "nothing in [prosecutor] Campbell's example that misrepresented heat-of-passion

18  manslaughter or distorted the given jury instructions."  *Stroman*, 2012 WL 2354112, at *19.  The

19  appellate court also rejected the argument that the prosecutor had suggested that her example was

20  the only type of voluntary manslaughter the law recognized.  "[H]er remark just before giving the

21  example, that this was the 'standard example,' certainly dispelled any such impression, in the full

22  context, by clarifying that this was just one, standard example."  *Id.*  The appellate court also

23  explained that it needed to consider the alleged misstatement of the law in full context.  *Id.* (citing

24  *Boyde v. California*, 494 U.S. 370, 384-85 (1990)).  The context here was that the prosecutor was

25  responding to Mr. Strellis' arguments (a) that Ms. Casteele's behavior was adequate provocation

26  for Mr. Stroman to kill Mr. Ogden and (b) that "impugned [prosecutor] Campbell's integrity for

27  her saying 'not one word' about manslaughter in opening remarks, assertedly so she could wait

28  until rebuttal, when Strellis would not have 'any chance to answer her.'"  *Id.*  The California Court

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

of Appeal found that the prosecutor's "remarks, in context, did not misstate the law. Indeed, she went on to say that the issue was not what went on between Stroman and Casteele, but between Stroman and *Ogden.* She was correct." *Id.* at 20. The appellate court "discern[ed] no reasonable likelihood that the jury applied any of the complained-of remarks in an objectionable fashion." *Id.*

The California Court of Appeal also determined that the "failure to timely object and seek an admonition . . . forfeited the issue for appeal." *Id.* Finally, that court found no error in the trial court's denial of the request to permit defense surrebuttal to counter the prosecutor's rebuttal argument. *Id.* The appellate court explained:

> First, there was no prosecutorial misconduct to counter. Second, this was not, as defendants characterize it, a ruling that deprived them of the opportunity to present a defense. They had ample opportunity to do so, and Strellis certainly tried, albeit on a flawed legal premise, to argue heat-of-passion manslaughter for Stroman. Varner's trial counsel did not make that argument, and his appellate counsel does not offer any factual support for it from the trial evidence. But his theory is that, had the jury convicted Stroman of manslaughter, it might have convicted him of the same crime based on supplying Stroman with a gun "but not intending Mr. Ogden's death." Absent evidence below on which to make a heat-of-passion argument as to himself, however, we do not see how Varner would have had any right to offer surrebuttal for himself. And so we need not explore his theory further than to note that it depends entirely on, and thus falls with, Stroman's appellate claim.

*Stroman*, 2012 WL 2354112, at *18-20.

2. <u>Analysis</u>

The appropriate standard of review for a prosecutorial misconduct claim in a federal habeas corpus action is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.") Under *Darden*, the inquiry is whether the prosecutor's remarks were improper and, if so, whether the comments infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). The "*Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (omission in original)

1 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

2       The California Court of Appeal's rejection of the prosecutorial misconduct claim was not

3 contrary to, or an unreasonable application of, clearly established law as set forth by the U.S.

4 Supreme Court.  A prosecutor's mischaracterization of the law is subject to objection and

5 correction by the court, although in an extreme case a misrepresentation of the law may affect the

6 jury's verdict.  *See generally Boyde v. California*, 494 U.S. 370, 384-85 (1990).  Here, however,

7 there was not even a misstatement of the law by the prosecutor.  The California Court of Appeal

8 determined that the prosecutor did not misstate the law of voluntary manslaughter in California.

9 *See Stroman*, 2012 WL 2354112, at *20; *see also People v. Moye*, 47 Cal. 4th 537, 549-50 (Cal.

10 2009 (alteration in original; citation omitted) ("[T]he factor which distinguishes the 'heat of

11 passion' form of voluntary manslaughter from murder is provocation. The provocation which

12 incites the defendant to homicidal conduct in the heat of passion must be caused by the victim, or

13 be conduct reasonably believed by the defendant to have been engaged in by the victim.")  The

14 state court's interpretation of state law binds a federal court sitting in habeas corpus.

15 *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988).

16       The state appellate court also properly considered the context in which the prosecutor's

17 comment was made in rejecting the prosecutorial misconduct claim.  "The prosecutor's comments

18 must be evaluated in light of the defense argument that preceded it."  *Darden*, 477 U.S. at 179;

19 *see, e.g., id.* at 181-82 (trial was not rendered fundamentally unfair when "[m]uch of the

20 objectionable content [of the prosecutors' closing argument] was invited by or was responsive to

21 the opening summation of the defense.")  Here, the legally correct example of voluntary

22 manslaughter was given by the prosecutor in response to Mr. Strellis' argument that misstated the

23 law of voluntary manslaughter and Mr. Strellis' argument that faulted the prosecutor for not

24 addressing voluntary manslaughter.  The prosecutor's argument, which did not misstate the law

25 (and was responsive to defense counsel's argument that did misstate the law), did not render the

26 trial fundamentally unfair.  *See Tan*, 413 F.3d at 1113 ("because we discern no assertion or

27 presentation of false facts, or any deception by the prosecutor, we conclude that this aspect of the

28 petitioners' case has no merit"); *see also San Nicolas v. Dexter,* 470 F. App'x 638, 642 (9th Cir.

**United States District Court**
For the Northern District of California

2012) ("None of what the prosecutor did or said during his closing argument was a misrepresentation of law. . . .  Moreover, any of the ways in which he characterized the law to favor his case were neutralized by admonitions that the judge gave the jury, warning them that the attorneys would be shading the law to favor their cases, as well as the jury instructions themselves, which were correct statements of law.").

Here, the prosecutor gave an extreme example of voluntary manslaughter – a parent walking in on his child being raped, and killing the rapist – but the prosecutor clearly identified her example as an example, rather than as setting the defining characteristics or describing the outer limits of a heat-of-passion voluntary manslaughter.  That is, the prosecutor did not say that voluntary manslaughter only occurs when a parent kills upon seeing his/her child being raped.  The prosecutor's example was, at worst, unhelpful because it was so unlike the facts in the Stroman/Varner case.  But a prosecutor providing an unhelpful (although legally correct) example does not render a trial fundamentally unfair.  "[A]rguments of counsel generally carry less weight with a jury than do instructions from the court.  The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates," whereas the latter "are viewed as definitive and binding statements of the law." *Boyde v. California*, 494 U.S. 370, 384-85 (1990) (citation omitted).  Here, the trial court instructed the jury on voluntary manslaughter, RT 1584-1587, and those instructions are unchallenged.  The court also instructed the jury that it "must accept the law" as stated by the court; "'[i]f anything concerning the law said by the attorneys in their arguments or at any time during the trial conflicts with my instructions, you must follow my instructions." RT 1561.  Messrs. Stroman and Varner have provided no reason to depart from the normal presumption that jurors follow the court's instructions. *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985).  Messrs. Varner and Stroman are not entitled to relief on their prosecutorial misconduct claim.

A separate and independent reason to deny relief on this claim is that the defense failed to make a contemporaneous objection to the alleged prosecutorial misconduct.  The trial court found the objection untimely, and the California Court of Appeal determined that the failure of the defense to timely object and seek an admonition forfeited the prosecutorial misconduct claim. *See*

31

**United States District Court**
For the Northern District of California

1   *Stroman*, 2012 WL 2454112, at *20.  A petitioner who fails to observe a state's "contemporaneous

2   objection" rules may not challenge the constitutionality of the conviction in federal court.  *See*

3   *Engle v. Isaac*, 456 U.S. 107, 124-29 (1982).  The Ninth Circuit has recognized and applied the

4   California contemporaneous objection rule in affirming denial of a federal petition on grounds of

5   procedural default where there was a failure to timely object at trial.  *See Inthavong v. Lamarque*,

6   420 F.3d 1055, 1058 (9th Cir. 2005) (claim was procedurally defaulted where California Court of

7   Appeal held that claim was procedurally barred under California law for failure to challenge the

8   admission of the confession at trial); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004)

9   (jury instruction error claim was procedurally defaulted where California Court of Appeal held

10  that claim was procedurally barred because defense counsel consented to the trial court's handling

11  of the issue); *Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999) (claim challenging denial

12  of peremptory challenges was procedurally defaulted because California Court of Appeal found

13  claim procedurally barred under state law requiring contemporaneous objection).

14  F.      Ineffective Assistance of Trial Counsel Claims

15          Messrs. Varner and Stroman claim that their attorneys provided ineffective assistance of

16  counsel at trial.  First, they both assert that their attorneys were ineffective in failing to request

17  accomplice-testimony instructions for use in connection with witness Lawrence Nero.  Second,

18  Mr. Stroman asserts that his attorney was ineffective in failing to timely object to the prosecutor's

19  misstatement of the law during closing argument.

20          1.      Accomplice-Testimony Instructions

21                  a.      Background

22          One or both defense counsel initially requested that the court instruct the jury about

23  accomplice testimony, but then withdrew the request during the jury instruction conference.  *See*

24  RT 1316.[6]

25  _____

26  [6] The proposed accomplice instructions withdrawn at the request of defense counsel were the
    following form instructions:

27          "You cannot find a defendant guilty based upon [the testimony of an accomplice] . . .

28  unless that testimony is corroborated by other evidence which tends to connect [the] [that]
    defendant with the commission of the offense.[¶ ]  [Testimony [of an accomplice] . . . includes any

**United States District Court**
For the Northern District of California

1       The California Court of Appeal rejected the underlying substantive claim, i.e., that the trial

2   court had a duty *sua sponte* to give the accomplice instructions.  The reasoning used to reject the

3   substantive claim also applies to the ineffective assistance of counsel claim.  The California Court

4   of Appeal determined that any instructional error was invited by the defense withdrawal of the

5   requested instructions.  The appellate court was able to "infer a tactical purpose" from counsel's

6   withdrawal of the request for the instructions and "the record supports both a legal and tactical

7   basis for the decision."  *Stroman*, 2012 WL 2354112, at \*17.  Under state law, accomplice

8   instructions apply to principals (including aiders and abettors), but not accessories to the crime, so

9   no instruction was required unless the evidence would warrant the jury in concluding that the

10  witness was an accomplice.  *Id.*

11

12              Having requested accomplice instructions but finding themselves at
            the close of evidence with nothing but speculation that Nero was
13          anything more than a passenger in the car during the events leading
            to and comprising the murder, counsel had good reason to withdraw
14          the request. Neither defendant testified, which left Nero as the sole
            witness to what was said and done in the car leading to the
15          confrontation. Nero claimed to be present for the tiff between
            Stroman and Casteele, Ogden's intercession, Stroman's drive away,
16          Varner's entering the car with the guns and passing the .25
            automatic to Stroman, Stroman's return to the scene and tailing of
17          the car in which Casteele and Ogden rode, Ogden's leaving the other
            car, and both defendants' armed assaults on him. Nothing in Nero's
18          account suggested that he urged getting the guns, going after or
            assaulting Ogden, or that he facilitated the events through his own
19          actions. According to Nero, he only left the car to get between

20  ─────────────────────────────────────────────────
    out-of-court statement purportedly made by [an accomplice] . . .  received for the purpose of
21  proving that what the [accomplice] . . .  stated out-of-court was true.]"  CALJIC 3.11.

22      "If the crime of ------- was committed by anyone, the witness was an accomplice as a
    matter of law and [his] [her] testimony is subject to the rule requiring corroboration."  CALJIC
23  3.16.

24      "To the extent that [an accomplice] . . .  gives testimony that tends to incriminate [the] [a]
    [another] defendant, it should be viewed with caution. This does not mean, however, that you may
25  arbitrarily disregard that testimony. You should give that testimony the weight you think it
    deserves after examining it with care and caution and in the light of all the evidence in this case."
26  CALJIC 3.18.

27      "You must determine whether the witness -------- was an accomplice as I have defined that
    term. [¶]  The defendant has the burden of proving by a preponderance of the evidence that --------
28  was an accomplice in the crime[s] charged against the defendant."  CALJIC 3.19.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Stroman and Ogden and keep them from fighting at their initial encounter. Nero was not the one to whom Varner passed the .25 automatic, and he watched the ensuing fatal encounter from the car. Even if, as Stroman suggests, jurors were willing to credit DaMaris Mata's aberrant account of *four* men leaving the car to approach Ogden, this did not show that Nero instigated, encouraged or assisted the attack. Mata clarified that she did not know or recognize any of the four people, and never saw any of them lay a hand on Ogden. It is also immaterial that, as Stroman stresses, police arrested Nero on suspicion of being an accessory (§ 32) to the murder. Accomplice instructions are not needed for accessories (*People v. Lewis, supra*, 26 Cal.4th at pp. 368−369), and we assess the need for trial instructions by the trial evidence, not speculation about the suspicions of arresting officers years before trial.

While the lack of evidentiary support was a legal reason for withdrawing the instruction request, there was also the strategic reality that the instructions could be a pointless distraction. The overall evidence against defendants was clearly sufficient for corroboration. "'Such evidence "may be slight and entitled to little consideration when standing alone." [Citations.]..It is only required that the evidence "''tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the [accomplice] is telling the truth.''" [Citation.]" (*People v. Sanders* (1995) 11 Cal.4th 475, 535.) And it need not corroborate *every fact* to which the witness testifies. (*People v. Davis* (2005) 36 Cal.4th 510, 543.) Nor was there much need for instruction on viewing Nero's testimony with caution. The most often cited rationale for the caution is that an accomplice usually testifies in the hope of favor or in an expectation of immunity, and that need is adequately conveyed where the jury is directly informed of any such inducement. (*People v. Hinton* (2006) 37 Cal.4th 839, 881 [immunity granted to witness].) Here, Nero testified in custodial garb and told the jury up front that he was awaiting sentencing in a drug case. This raised a strong inference of expected favor, without the caution instruction.

There was also value in Nero's testimony for both defendants, so that their counsel could reasonably feel it was better not to impose burdens on the jury's consideration of his account. Nero's inconsistencies provided ample fodder for attacking whatever parts each defendant found the most damaging, and neither defendant would be strategically well served by instructing the jury to distrust *everything* he said. Varner in particular could revel in Nero's explanation that he lied in police statements about seeing Varner shoot at Ogden because, being unfamiliar with the law and not yet 18 years old, he felt pressure to go along with his examiner and say whatever it took to end the interviews. Voluntary intoxication instruction would propose that neither defendant actually formed specific intents or other mental states, and Nero testified that he was high on alcohol, marijuana and Ecstasy during the crimes, and that defendants were also intoxicated. Varner, he said, drank "[a] few pints" of "Remy" (apparently meaning Remy Martin cognac), smoked "[a] lot" of "weed," and took Ecstasy throughout that day, and Stroman took Ecstasy and drank Remy. Nero said that there was never any discussion in the car about hurting Ogden, another nice

boost for both defendants. He also recounted the intensity of the arguments between Stroman and Casteele, and then between Stroman and Ogden, potentially fueling defense instruction on heat-of-passion manslaughter, an avenue away from murder. Nero, a longtime friend of Ogden's, testified that he had seen Ogden with guns before. With neither defendant testifying, these firsthand accounts were strategically vital.

*Stroman*, 2012 WL 2354112, at *17-18.

    b.    Analysis

The Sixth Amendment's right to counsel guarantees not only assistance, but effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things. First, he must demonstrate that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms. *Id* at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011). The "question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

The ineffective assistance of counsel claim was only presented to the California Supreme Court in the habeas petitions from Messrs. Varner and Stroman. The California Supreme Court's summary denial of those claims was not contrary to, or an unreasonable application of, *Strickland*. When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists

1    could disagree that those arguments or theories are inconsistent with the holding in a prior

2    decision of [the U.S. Supreme] Court." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

3           The California Supreme Court reasonably could have rejected the ineffective assistance of

4    counsel claim by relying on the reasoning used by the California Court of Appeal to reject the

5    underlying claim of error in not providing the accomplice-testimony instruction.  The California

6    Supreme Court reasonably could have concluded that counsel did not engage in deficient

7    performance in withdrawing the request for accomplice-testimony instructions, and that no

8    prejudice flowed from the withdrawal of the instructions for several reasons.  First, it was

9    questionable whether Mr. Nero was an accomplice rather than an accessory, and accomplice

10   instructions were not necessary or applicable if he was only an accessory.  CALJIC 3.19 would

11   have put the burden on the defendants to prove that Mr. Nero was an accomplice.  Second, the

12   requirement that the accomplice's testimony be corroborated (*see* CALJIC 3.11) only necessitated

13   "slight" corroborating evidence and not on every detail, and was clearly met in this case, as the

14   California Court of Appeal explained.  Third, Mr. Nero's situation was made known to the jury

15   (i.e., he was in jail awaiting sentencing), so there was not "much need for instruction on viewing

16   Nero's testimony with caution."  *Stroman*, 2012 WL 2354112, at *18.  Fourth and most

17   significantly, Mr. Nero testified to some things that were helpful to the defense, and instructions

18   about viewing his testimony with caution would have applied to all his testimony and reduced the

19   likelihood that the defendants could capitalize on any part of his testimony.  For example, Mr.

20   Nero's testimony that there was no discussion in the car about hurting Mr. Ogden supported an

21   argument that premeditation and deliberation was lacking, and Mr. Nero's testimony about the

22   alcohol and drug consumption allowed the defense to argue that the requisite mental states were

23   absent.

24          In this case, the omission of the instructions was not the result of an oversight; defense

25   counsel specifically requested and then withdrew the request for accomplice-testimony

26   instructions.  "*Strickland* specifically commands that a court 'must indulge [the] strong

27   presumption' that counsel 'made all significant decisions in the exercise of reasonable professional

28   judgment." *Cullen v. Pinholster*, 563 U.S. at 196 (alteration in original).  Messrs. Varner and

United States District Court
For the Northern District of California

1    Stroman show no reason to disregard that strong presumption here, especially where, as here, there

2    were good legal and tactical reasons to do so.  *Cf. Knowles v. Mirzayance*, 556 U.S.111, 122-24

3    (abandoning a defense that has "almost no chance of success" is reasonable, even if there is

4    "nothing to lose" by preserving the defense).  "[S]trategic choices made after thorough

5    investigation of law and facts relevant to plausible options are virtually unchallengeable; and

6    strategic choices made after less than complete investigation are reasonable precisely to the extent

7    that reasonable professional judgments support the limitations on investigation."  *Strickland*, 466

8    U.S. at 690; *see, e.g., Soto v. Ryan*, 760 F.3d 947, 979-80 (9th Cir. 2014) (tactical decision to call

9    informant as a defense witness not unreasonable because value of testimony to petitioner's defense

10   outweighed dangers of calling informant to testify); *Madayag v. Evans*, 442 F. App'x 354, 355-56

11   (9th Cir. 2011) ("trial counsel was not ineffective in failing to request a 'defense of others' jury

12   instruction because he made a tactical decision not to seek jury instructions contradicting

13   Madayag's theory at trial that there was no evidence of Madayag actually approaching and

14   assaulting the prison guard"); *Miller v. Nooth*, 403 F. App's 291, 292 (9th Cir. 2010) (failure to

15   request jury instruction on lesser-included offense not deficient performance because counsel

16   averred that, after consultation with client, "they jointly made a strategic decision to pursue an

17   'all-or-nothing' approach to obtain an outright acquittal"); *Stenson v. Lambert*, 504 F.3d 873, 889

18   (9th Cir. 2007) (counsel's refusal to pursue defendant's suggested trial strategy (of blaming

19   murders on one victim's wife) was not deficient performance where attorney determined after

20   reasonable investigation that evidence in support of theory was not admissible); *but see Crace v.

21   Herzog*, 798 F.3d 840, 852 (9th Cir. 2015) (no deference for trial attorney's failure to request

22   instruction "when it is based on 'a misunderstanding of the law' rather than 'a strategic decision to

23   for[]go one defense in favor of another'").  It would not have been an unreasonable application of

24   *Strickland* for the California Supreme Court to determine that the deficient performance prong had

25   not been established.  Messrs. Varner and Stroman are not entitled to the writ on this claim.

26         2.    Counsel's Failure to Timely Object To Prosecutor's Misstatement Of The Law

27         Mr. Stroman urges that counsel provided ineffective assistance in failing to timely object

28   to the prosecutor's alleged misstatement of the law regarding heat of passion and voluntary

**United States District Court**
For the Northern District of California

1    manslaughter.

2         Mr. Stroman's ineffective assistance of counsel claim was rejected without discussion by

3    the California Supreme Court.  That court reasonably could have determined that Mr. Stroman had

4    failed to show "a reasonable probability that," but for counsel's failure to make a timely objection

5    to the prosecutor's comment, "the result of the proceeding would have been different."  *Strickland*,

6    466 U.S. at 694.  The substantive claim that the prosecutor engaged in misconduct is discussed

7    and rejected in Section E, above.  As noted there, the California Court of Appeal concluded that

8    the prosecutor's example did not misrepresent the law and her comments, in context, were not

9    improper.  *See Stroman*, 2012 WL 2354112, at *19-20.  The California Court of Appeal also

10   "discern[ed] no reasonable likelihood that the jury applied any of the complained-of remarks in an

11   objectionable fashion."  *Id.* at 20.  Given those determinations – that the law was not misstated, the

12   comments were not improper, and there was no reasonable likelihood the jury misapplied the

13   example – it would have been a reasonable application of *Strickland* for the California Supreme

14   Court to conclude that the ineffective-assistance claim failed on the prejudice prong.[7]

15   G.    Ineffective Assistance of Appellate Counsel

16        Finally, Messrs. Stroman and Varner allege that their appellate attorneys provided

17   ineffective assistance because they failed to present in their appellate brief the foregoing claims for

18   ineffective assistance of trial counsel.  These claims were summarily denied by the California

19   Supreme Court.

20        The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the

21   effective assistance of counsel on his first appeal as of right.  *See Evitts v. Lucey*, 469 U.S. 387,

22   391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to

23   the standard set out in *Strickland*.  *See Smith v. Robbins,* 528 U.S. 259, 285 (2000).  First, the

24   _____

25   [7] The heading for Mr. Stroman's ineffective assistance claim also faults counsel for having
     dyslexia and failing to subject the state's case to meaningful adversarial testing.  *See* Docket No. 1
26   at 16 in Case No. C 14-2245 EMC.  He does not further elaborate on these assertions, other than to
     argue that counsel was ineffective with regard to the accomplice instructions and in not objecting
27   to the prosecutor's alleged misstatement of the law.  With regard to his contention that counsel had
     dyslexia, the claim is conclusory and fails to show entitlement to habeas relief.  That is, he has not
28   shown how counsel's dyslexia (assuming it existed) caused counsel to engage in deficient
     performance and has not shown any resulting prejudice.

United States District Court
For the Northern District of California

petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue.  *Smith*, 528 U.S. at 285; *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010).  Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal.  *Smith*, 528 U.S. at 285-86; *Moormann*, 628 F.3d at 1106.

To determine whether appellate counsel's failure to raise a claim of ineffective assistance of trial counsel was objectively unreasonable and prejudicial, the district court must first assess the merits of the underlying claim that trial counsel provided constitutionally deficient performance. *Moormann*, 628 F.3d at 1106-07.  If trial counsel's performance was not objectively unreasonable or did not prejudice the petitioner, then appellate counsel did not act unreasonably in failing to raise a meritless claim of ineffective assistance of counsel, and the petitioner was not prejudiced by appellate counsel's omission.  *Id*.

The California Supreme Court's rejection of the ineffective assistance of appellate counsel claims of Messrs. Varner and Stroman was not contrary to or an unreasonable application of clearly established precedent from the U.S. Supreme Court.  As explained in Section F, above, the ineffective assistance of trial counsel claims are not meritorious.  Appellate counsel was not ineffective in not raising trial counsel's ineffectiveness as a basis for reversal on appeal.  Messrs. Varner and Stroman are not entitled to relief on this claim.

H.    No Certificate of Appealability For Either Petitioner

A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  Neither Mr. Stroman's case nor Mr. Varner's case is a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is **DENIED** in each case.

///

///

///

# VI.   **CONCLUSION**

For the foregoing reasons, the petitions for the writ of habeas corpus are **DENIED** on the merits.  The Clerk shall close the files.

**IT IS SO ORDERED.**

Dated: March 30, 2016

EDWARD M. CHEN
United States District Judge